**Robert POWELL et al.**

v.

**The PENNSYLVANIA RAILROAD COMPANY et al.**

**Civ. A. No. 20850.**

United States District Court
E. D. Pennsylvania.

March 7, 1958.

On Petition for Allowance of Counsel Fees June 24, 1958.

On Motion to Vacate Order of Court Approving Compromise Settlement July 28, 1958.

Lawrence J. Richette (of Meehan, Neil & Richette), Philadelphia, Pa., Harold K. Wood, U. S. Atty., Philadelphia, Pa., for plaintiff.

Philip Price, Owen B. Rhoads, Philadelphia, Pa., for Pennsylvania R. R. Co.

Saul, Ewing, Remick & Saul, Philadelphia, Pa., for G. M. Harrison, Brotherhood of Ry. & S.S. Clerks, Pennsylvania System Board of Adjustment, S. V. M. Loehr.

KIRKPATRICK, Chief Judge.

This action, though not such in form, has become, in substance, a suit for the enforcement of an order of the National Railroad Adjustment Board. The order in question was dated January 25, 1949, and was based upon two grievances, filed in 1944 and 1945 by the Brotherhood against the Pennsylvania Railroad, complaining of its use in two of its freight stations of employees of an independent contractor (Pilot Contracting Company), thereby depriving its regular employees of the opportunity to earn overtime. It awarded overtime pay to employees "covered by the Agreement" (collective

bargaining agreement of May 1, 1942) but otherwise unidentified. No payments under the order were made to anyone for more than seven years and until after this suit was begun. Then the Railroad deposited $300,000 (plus $25,000 for costs) with the clerk of the court pursuant to a stipulation agreed to by all parties to this action, which provided among other things that "the Court by appropriate proceedings will determine the claimants entitled to share in the $300,000 fund."

The stipulation limits the persons entitled to share to claimants who were (1) "employed by the Pennsylvania Railroad Company in the Philadelphia area", (2) "in the classes represented by the Brotherhood on dates when Pilot employes were used", and (3) "who by reason of the use of Pilot employes were defeated in their desire and ability, based on availability, to perform overtime work". The Court is bound to carry out the terms of the stipulation, but it must be assumed that in entering into the stipulation it was the purpose and intent of the parties that the money should go to the persons for whose benefit the award was made. This requires a consideration of the grievance upon which the award was made, the terms of the award itself and the surrounding circumstances.

The grievance filed in 1944 reads "Filing claim * * * in behalf of Albert Farrier * * * and all other employes working at South Phila. Freight Station who are represented and will be designated by the Brotherhood to participate in this claim." The later grievance was in substantially the same form but filed on behalf of the employees of the Philadelphia Transfer.

In 1949 the Railroad Adjustment Board acting on these grievances made the order referred to above, reading in part, "If on a proper showing it can be proven that employes covered by the Agreement were defeated in their desire and ability, based on availability, to perform overtime work, then they are to be compensated at the rate of pay covered in their collective Agreement with the Carrier."

The Brotherhood and the Railroad were unable to arrive at any agreement as to who were entitled to participate and how much each should receive under this award. This suit was then brought as a class action against both the Brotherhood and the Railroad because of their failure to put the order of the Adjustment Board into effect.

The record plaintiffs contend that the only persons entitled to share are those whose names appear on a list prepared by the Brotherhood after the Board's decision was handed down and subsequently revised but never agreed to by the Railroad. This list consists of about 800 names and includes employees working during the Pilot contract period, not only at the South Philadelphia Freight Station and Philadelphia Transfer, but all over the Philadelphia area. All the employees named in it were members of the Brotherhood at the time of the Pilot contract and also at the time the list was made up. The attorneys for the plaintiffs hold powers of attorney from most of them.

The Brotherhood's present contention is that all employees, whether members of the Brotherhood or not, who were employed at either of the two freight stations, are entitled to share. It is estimated that perhaps as many as 4,000 employees could participate under this view. Since the collective bargaining agreement provided that all claims for compensation must be filed within 90 days of the date on which the claim arose, the only persons entitled to share in the money now deposited in court are those for whom the Brotherhood was acting when it filed the grievances.

Now, the grievances filed were on behalf of the employees at the South Philadelphia Freight Station and the Philadelphia Transfer. There is no mention of employees employed elsewhere but who might have desired to transfer to one of these stations for additional overtime work, and the grievance was definitely

not filed on their behalf. Nor do I read the decision of the Board as attempting, in this respect, to go beyond the grievance filed, and I find in the award no evidence of any intent to include persons other than those employed at the two stations. I, therefore, cannot accept any of the lists urged by the plaintiffs since they were compiled of Brotherhood members wherever they might be employed in Philadelphia, so long as they were employees of the Pennsylvania Railroad.

Moreover, due to the impracticability of determining in the case of each employee in the entire Philadelphia area his desire and availability to perform overtime work at the two places in question, I think that, even if there were no other reasons for so doing, it would be reasonable to limit the employees entitled to share to those who were during the "Pilot" period employed at South Philadelphia and Philadelphia Transfer, being influenced by what seems to be a reasonable assumption that they were desirous of earning overtime and available for it and that employees in other places in the Philadelphia area were not.

The next question is as to whether non-union employees, as well as members of the Brotherhood, are entitled to share. At the time these claims arose, approximately one-third of the employees at these two freight stations were union members. The Brotherhood's Protective Laws (Sec. 10(c)) provided "No grievance originating prior to the time the aggrieved became a member of the Brotherhood * * * shall be considered." The plaintiffs argue from this that the Brotherhood could not have filed the claim on behalf of non-union members and that, therefore, non-members are not entitled to share in the money in court, since their claims were not filed within 90 days of the time when the claim arose. This argument is a weighty one and is perhaps in accordance with what the Brotherhood thought it was doing. At least, it has so conducted itself until quite recently. The persons designated by it from time to time were always members of the Brotherhood in good standing at the time the designation was made. However, I do not think that, even if a specific intent on the part of the Brotherhood to represent only Brotherhood members were shown, it could limit the effectiveness of the award of the Board in view of what appears to have been the clear intention of the Board to dispose of the entire dispute, as indicated by its use of the phrase "employes covered by the Agreement". The thing to be ascertained is not what the Brotherhood thought or intended but what the Adjustment Board actually did.

The Brotherhood was under a duty to represent all of the members of the craft. Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80. The grievance filed, though ambiguous, can be read as carrying out this duty since it refers to those represented by the Brotherhood.[1] There is nothing in the claim limiting it to particular persons and it expressly provided that the Brotherhood would designate specific individuals entitled to relief after the award was made.

The existence of the Protective Law referred to above cannot affect the result. A person or union will be assumed to act in accordance with the duty which it owes to those whom it represents as a collective bargaining agent, rather than be assumed to favor a segment of those whom it represents, namely, its own dues paying members. The Court of Appeals for the Third Circuit was presented with a similar problem in Kirby v. Pennsylvania Railroad, 188 F.2d 793, 796. In that case the plaintiffs, seeking to enforce an order of the Adjustment Board, were clearly not those who had prosecuted the grievance. Judge Goodrich said "The statute provides for enforcement of a Board order not only at the suit of petitioner before the Board, but by 'any person for whose benefit such order was made.' We conclude that plaintiffs' complaint is sufficient to show that they are persons for

---

1. It does not say "members of the Brotherhood".

whose benefit Award No. 4291 was made, and that they have standing to seek enforcement of it."

I cannot distinguish the present case from the Kirby case on the ground that this action is not, in form, to enforce an order of the Railroad Adjustment Board but is rather a suit against both the Brotherhood and the Railroad because they failed to comply with an order. The only persons entitled to bring such an action would, of course, be those who were the beneficiaries of the award, and I conclude that the intended beneficiaries of the award were those employed in job classifications doing work similar to the work done by the contractor's employees at either the South Philadelphia Freight Station or the Philadelphia Transfer during the times in question, whether they were members of the Brotherhood or not.

■ The formula submitted by the Brotherhood for dividing the money among those entitled to it seems to offer a practicable and reasonable approach to the problem. However, the money available should not be divided by the number of employees entitled to share in theory, but should be divided by the number of claimants who qualify. Subject to the foregoing, I adopt the formula submitted by the Brotherhood.

If the parties are unable to agree as to the job classifications and individuals entitled to share in the fund, application may be made to the Court for the appointment of a master to assist the Court in determining these questions. It is hoped the parties will agree as to a method of giving notice to those entitled to share and as to a time limit within which their claims must be presented, and the order submitted to carry out the terms of this opinion may contain such provisions and a provision barring all claims not filed in compliance with it.

### On Petition for Allowance of Counsel Fees

A brief account of the proceedings leading up to the payment into court of the $325,000 fund, now in process of distribution, appears in the opinion of this Court, filed March 7, 1958. Counsel representing the plaintiffs in this action, which is a class action brought in behalf of all persons similarly situated, have filed a petition for the allowance of the sum of $100,000 as counsel fees. The petitioners hold powers of attorney authorizing them to represent some 782 employees of the Railroad Company, but it has not, at the present time, been ascertained how many of the petitioners' clients are entitled to receive shares under the order of Court providing for distribution of the fund. The powers of attorney which the petitioners hold provide for a contingent fee of one-third of the amount obtained in each case but their request is for an award out of the $325,000 fund and the petitioners have filed with the Court a written statement giving up all claim for compensation from their individual clients. The petitioners have already received an interim allowance of $15,000.

The Brotherhood contends, first, that the petitioners are not and have not been entitled to any allowance whatever out of the fund and, second, that in any event the amount claimed is excessive and their services do not entitle them to anything more than the amount of the interim allowance already received.

The strongest argument made by the Brotherhood against the allowance of any counsel fees from the fund is based upon the decision of the Circuit Court of Appeals in Edison Light & Power Co. v. Pennsylvania Public Utility Commission, 3 Cir., 119 F.2d 779, affirming per curiam the decision of this Court reported at 34 F.Supp. 939, 942. In the opinion, this Court said, "No statement of the rule on which the petitioners rely has ever extended it to a case in which all the other beneficiaries of the fund have been at every stage of the proceeding which resulted in the creation of the fund actively and adequately represented, and the equitable considerations upon which the rule is based forbid its application in such cases."

The facts of the Edison case, however, present a very different picture from

those of the present one. In the former, the entire body of consumers of power, all of whom were beneficiaries in the fund, were represented vigorously and efficiently from beginning to end by the Public Utility Commission of Pennsylvania, its legal staff and the Attorney General of the Commonwealth.

It is true that the Brotherhood has throughout these proceedings represented, at least in theory, not only its own members but also all of the members of the craft (Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80). However, it is a fact that, although at the outset it succeeded in establishing liability on the part of the Railroad, its efforts to produce any money were totally ineffective for a period of upwards of eight and one-half years.[1]

Establishing a legal liability does not of itself bring any fund into being. In the present case it was not until after the petitioners, in June of 1956, began this action—an action not only against the Railroad Company but also against the Brotherhood, charging the latter with neglect of its duty to enforce the award—that the Railroad Company made an offer of payment which resulted, a year later, in the payment into Court of $325,000. I think there is no doubt that these petitioners were instrumental in transmuting the Railroad's liability to pay into money and so creating the fund.

▮ As to the amount of the fee. It is true that no expert testimony was produced as to the value of the petitioners' services but this is unnecessary. The petitioners themselves have testified as to what they did, the time spent, etc., and have offered their opinion as to what their services are worth.

By this time, I am familiar enough with the history of the entire proceeding from its inception as well as what has been done in the present suit to be able to form a judgment upon the point.

A great deal of the time spent by the petitioners was in assisting the Committee who retained them in locating claimants and obtaining powers of attorney from them. It may have been of some slight advantage to the plaintiffs and the class in whose behalf they brought this suit to have authorization from as large a body of claimants as possible, but the great bulk of that particular effort is not compensable out of the fund, especially as the petitioners endeavored to confine the beneficiaries of the award to their own clients and vigorously opposed the claims of the great majority whom the Court has found entitled to share. However, their efforts in recovering the fund were of substantial benefit to the whole class. They are entitled to compensation and I think it fair and equitable that it should be paid out of the fund.

Of course, the petitioners had no part in establishing the Railroad's liability and obtaining the award. It is immaterial that the Brotherhood is making no claim upon the fund for that achievement. The point is that, unlike most cases involving claims for fees out of funds of this kind, the initial and indispensable step leading to the creation of the fund cannot be considered in evaluating the petitioners' services.

The petitioners rely strongly on the fact that nearly 800 employees did agree to pay them one-third of the amount obtained, as an indication that a fee in that amount would be reasonable. The relevancy of these private contracts is too remote to have more than the very slightest bearing on the question before the Court.

While courts, in fixing the amount of an allowance, have on occasion taken into consideration the fact that compensation

---

1. This is not to say that the Brotherhood was wholly inactive during all that time. As a matter of fact, it did a good deal of work in preparing and submitting to the Railroad Company lists of employees who, it asserted, were entitled to share in the award. The trouble was that it was working upon a legally unsound and practically unworkable theory, and the Railroad kept refusing to agree— not entirely without justification.

was contingent upon the success of the proceeding, this case does not quite present that feature. As soon as the award of the Railway Labor Board was entered, it was reasonably certain that a fund would sooner or later come into existence, and although the work of bringing it into being, determining the parties entitled and providing for distribution was sure to prove, and did prove, an arduous task, these petitioners did not have to start from scratch.

■ On the whole, I think that an allowance of $15,000 out of the fund in addition to the $15,000 already allowed would be fair compensation for the services rendered to the class as a whole.

A form or order in accordance with the foregoing may be presented.

### On Motion to Vacate Order of Court Approving Compromise Settlement

For a complete understanding of the nature of this case, reference may be had to the two opinions of this Court filed, respectively, March 7, 1958, and June 24, 1958.

In brief, the suit was a class action in which the plaintiffs, employees of the Pennsylvania Railroad Company appearing in behalf of themselves and others similarly situated, sought, among other things, to compel the Railroad Company to pay an award, made by the National Railroad Adjustment Board, of overtime pay to certain of its employees. The complaint was filed on June 8, 1956. The Railroad, the union and the chairman of the System Board of Adjustment, named as defendants, appeared by counsel.

On September 7, 1957, the case was settled by a stipulation of counsel, approved and put into effect by order of this Court dated the same day, in pursuance of which the Railroad paid into court the sum of $300,000 for disbursement among claimants entitled and $25,-000 to cover costs, and the action was dismissed as to it. The stipulation further provided that "the Court by appropriate proceedings will determine the claimants entitled to share in the $300,-000 fund".

On March 7, 1958, the Court filed its opinion defining the class of persons entitled to share in the fund. Since April 18 of this year, the Court, through an administrator, had been engaged in locating and notifying the individuals constituting that class.

Before the attorneys began this action, they obtained powers of attorney from 782 employees authorizing them to institute and prosecute it and agreeing in each case to pay a contingent fee of one-third of the amount obtained. However, as a result of the Court's determination of what employees were entitled to share in the award, not only was a total of more than 3,000 employees included, but a large proportion of the 782 were excluded. The opinion of March 7, 1958, thus adjudicated what persons were "similarly situated" with the record plaintiffs and, hence, identified the class for whom the record plaintiffs brought the action.

This motion, which is, to say the least, an extraordinary one, is to vacate the Court's order of September 7 and is based on the assertion of these attorneys that they entered into the stipulation, which it approved, without any knowledge on the part of their clients whom they designate as "the plaintiffs" and that the parties in question considered the stipulation "as outside the scope of the authority granted to their attorneys".

As I understand the current contention of the attorneys, it is that when they brought the suit they were of the opinion that the class of persons "similarly situated" represented by the plaintiffs consisted of the 782 who had given them powers of attorney; that they brought the suit in behalf of those persons and no others; that they had authority to accept $300,000 and settle the case if, and only if, their clients got the whole award; that, as soon as the Court decided that a large number of other persons constituted the class of "persons similarly situ-

ated" represented by the record plaintiffs, their authority to make the settlement became void ab initio. In other words, they now assert that they represented an artificial class, different from that which the Court found to constitute the "persons similarly situated"; that they had no authority to enter into a settlement which might turn out unfavorably for their artificial class; and that they had no authority of any kind from the 3,000 or more whom the Court found to be entitled because they never represented them.[1]

It will be noted that the order and the stipulation upon which it was based really consist of two parts (1) an agreement that the Court will determine by appropriate proceedings the persons entitled to share, describing them in general terms consistent with the cause of action. No artificial class is set up in the stipulation, and those who are entitled to share in the fund are those who would have been entitled to recover had the lawsuit run its normal course. (2) An agreement at to the amount to be paid by the Railroad in full settlement of its obligation under the award.

It is not suggested that these attorneys filed this complaint by inadvertence, and it cannot be questioned that they were fully authorized to do so. Although the complaint is filed for the record plaintiffs and all similarly situated persons, I will assume for the purposes of this discussion that the attorneys believed at that time that the only similarly situated persons entitled to share were the 782.

(1) Now, as to the part of the stipulation which provided for the determination by the Court of the claimants, it cannot be argued that an attorney employed to prosecute a civil lawsuit is not fully authorized by the nature of his employment and without consulting his client to agree that certain issues shall be submitted to the Court without a jury, even with the understanding that the findings or award will be final and conclusive. 7 C.J.S. Attorney and Client § 91. In this regard the agreement was binding upon the parties represented by the attorneys, whoever they might have been, without the necessity of their express authorization or even of their knowledge.

(2) As to the part of the stipulation agreeing to accept $300,000 in full settlement of all claims, it is argued that it is not within the implied scope of authority of an attorney employed to prosecute a lawsuit to accept a figure in full settlement and discharge of his client's rights without the knowledge or consent of the client. That may be true, but counsel have stated to the Court on half a dozen occasions, the last one being in a letter received as late as July 21, 1958, that the 782, referred to variously as "the plain-

---

1. Contradictory statements by the attorneys as to whom they represented at different stages of this proceeding leave me in some doubt as to whether the assumption that I have just made as to their position is correct. For example, when it came to obtaining compensation out of the $300,000 fund for their services in creating the fund—compensation to which they would have been entitled only on the basis that they represented all parties entitled to share—they took the position that they represented the entire class as determined by the Court. Thus, in their letter of April 29, 1958, they speak of "our view that we represent the entire class" and say that the one-third contingent arrangement which they made with 782 employees "is but an indication on the part of these beneficiaries of the general contract for legal services to be made applicable to the entire class. That is the only reason for our filing these powers of attorney with the Clerk of the District Court". On June 10, 1958, they wrote a letter to the Court containing the statement "our position being that our fee will come from the $300,000.00 which we brought about as a result of this litigation and our negotiations with the railroad on behalf of the entire class of claimants". Both these letters were written with full knowledge that the Court had already by its opinion of March 7, determined that the "entire class" of employees entitled to share consisted of not just the 782 but some 3,000 to 4,000 in all, and not all of the 782.

At any rate, the view I have taken above probably states the best case for the attorneys that can be made.

tiffs" and "our client", specifically authorized them to accept the $300,000.

■ The attorneys began this suit as a class action. The class they represented was necessarily made up of all persons entitled to share in the award of the Adjustment Board. They have consistently asserted that they were authorized to settle by representatives of the class. The fact that what they had in mind was an artificial class set up by themselves consisting only of persons from whom they held powers of attorney, many of whom were ultimately determined not to be members of the class, does not affect the situation. In fact, if their authority was so limited, their signing of the stipulation accepting the settlement on behalf of the entire class to be determined by the Court would have been a misrepresentation of their authority and an imposition upon the Court. These attorneys still represent the record plaintiffs who in turn represent the entire class determined by the Court to be entitled to share in the award. These persons having assented to the settlement and having obtained for their counsel a partial allowance of $15,000 (as to which no offer to repay has been forthcoming) cannot now disavow their authority to settle and successfully press this motion. As a matter of fact, no one has come forward to protest the settlement other than those represented by these attorneys.

It is further to be observed that, since shortly after April 18, the administrative work of ascertaining the whereabouts of individuals entitled to share and notifying them has been going on through an administrator appointed by the Court and a staff of employees. Over $5,000 has been spent in this work and additional obligations have been incurred amounting to at least one-half of that amount. All of this activity and expense was incurred with the full knowledge and acquiescence of the plaintiffs' attorneys and, under the circumstances of this case, their failure to notify their clients as to the exact manner in which the settlement was being carried forward might or might not be a matter of dispute between attorney and client, but the acquiescence of the attorney must be imputed to the client.

I will not, on the motion of these attorneys, undo what has been done, accepted and acquiesced in and the final implementation of which has gone a long way toward completion.

The motion is denied.